UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

DEVIN G. NUNES,

        Plaintiff,

v.

WP COMPANY LLC,
D/B/A THE WASHINGTON POST,
AND SHANE HARRIS,

        Defendants.

Case No. 3:20-cv-146

# MEMORANDUM OF LAW IN SUPPORT OF
# THE WASHINGTON POST'S MOTION TO DISMISS

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (*pro hac vice* pending)
Thomas G. Hentoff (*pro hac vice* pending)
Nicholas G. Gamse (*pro hac vice* pending)
Emily A. Rose (VSB No. 89529)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
erose@wc.com

*Counsel for WP Company LLC*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................3

    A.    Representative Nunes.....................................................................................3

    B.    The Post Article ...........................................................................................4

    C.    The Complaint ..............................................................................................5

LEGAL STANDARD......................................................................................................6

ARGUMENT ..................................................................................................................7

I.       PLAINTIFF FAILS TO STATE A DEFAMATION CLAIM. ...........................................7

    A.    Plaintiff Has Not Alleged a False and Defamatory Statement or
Implication. ...............................................................................................8

    B.    Plaintiff Has Not Plausibly Alleged Actual Malice.................................12

    C.    The Defamation Claim Must Also Be Dismissed Because of Plaintiff's
Failure to Comply with the California Retraction Statute. ....................17

          1.    The Case is Governed by the Law of Rep. Nunes's Home State,
California. .................................................................................17

          2.    Rep. Nunes Failed to Comply with the California Retraction
Statute. ......................................................................................22

                a.    The Retraction Statute Applies to the Post's Article. ...................23

                b.    Rep. Nunes Did Not Comply with the Retraction Statute. ............24

          3.    The Complaint Fails Plausibly to Allege Special Damages. ....................24

II.     PLAINTIFF FAILS TO STATE A CONSPIRACY CLAIM FOR ADDITIONAL
REASONS. ..............................................................................................26

CONCLUSION..............................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adventure Outdoors, Inc. v. Bloomberg*, 2007 WL 9735875 (N.D. Ga. Dec. 18, 2007) ....................................................................................................................19

*Anderson v. Hearst Publ'g Co.*, 120 F. Supp. 850 (S.D. Cal. 1954) ................................24, 25, 26

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) ..............................................................7, 14

*Arthur v. Offit*, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) .........................................................7

*Ascend Health Corp. v. Wells*, 2013 WL 1010589 (E.D.N.C. Mar. 14, 2013).......................19, 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ *passim*

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483 (E.D. Va. 2003) ................................................................................................................28

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ...............................................................3, 6, 27

*Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183 (E.D. Va. Apr. 25, 2012) ...............................................................................................................13, 17

*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) ................................................................13

*Chapin v. Knight-Ridder, Inc.,* 993 F.2d 1087 (4th Cir. 1993).............................................. *passim*

*Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652 (E.D. Va. 2019) ..................................................................................................................20, 21

*Cox v. MAG Mut. Ins. Co.*, 2015 WL 1640513 (E.D. Va. Apr. 9, 2015)................................27, 28

*Dodds v. Am. Broad. Co., Inc.*, 145 F.3d 1053 (9th Cir. 1998) ....................................................10

*FAA v. Cooper*, 566 U.S. 284 (2012)............................................................................................26

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018).........................................................13, 14

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ..............................................................27

*Garrison v. Louisiana,* 379 U.S. 64 (1964) ..................................................................................13

*Gilmore v. Jones*, 370 F. Supp. 3d 630 (W.D. Va. 2019)...................................................... *passim*

*Harper v. Lugbauer*, 2011 WL 6329870 (N.D. Cal. Nov. 29, 2011) ...........................................27

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) .....................................14, 15

*Hatfill v. Foster*, 415 F. Supp. 2d 353 (S.D.N.Y. 2006)................................................18, 19, 21, 22

*Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522 (E.D. Va. 2007) ......................................................8

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*, 2014 WL 6892141
(C.D. Cal. Nov. 5, 2014)..............................................................................................................26

*Horace Mann Ins. v. Gen. Star Nat'l Ins.*, 514 F.3d 327 (4th Cir. 2008) ......................................17

*Howard v. Antilla*, 294 F.3d 244 (1st Cir. 2002) ............................................................................16

*Hudson Assocs. Consulting, Inc. v. Weidner*, 2010 WL 1980291 (D. Kan. May 18,
2010) ............................................................................................................................................19

*In re Cable News Network*, 106 F. Supp. 2d at 1001–02 ...............................................................26

*Jenkins v. Snyder*, 2001 WL 755818 (E.D. Va. Feb. 6, 2001).............................................10, 11, 12

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ...........................................12

*King v. Am. Broad. Cos., Inc.*, 1998 WL 665141 (S.D.N.Y. Sept. 28, 1998) ..............2, 24, 25, 26

*Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*, 2017 WL
2385343 (E.D. Va. June 1, 2017)...........................................................................................18, 28

*Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018)............................................9

*Lokhova v. Halper*, 2020 WL 963032 (E.D. Va. Feb. 27, 2020)........................................4, 27, 28

*Martin v. Wells Fargo Bank*, 2018 WL 6333688 (C.D. Cal. Jan. 18, 2018) ................................26

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ...........................................................8, 13

*Mayfield v. NASCAR*, 674 F.3d 369 (4th Cir. 2012)........................................................13, 14, 17

*McFarlane v. Esquire Magazine*, 74 F.3d 1296 (D.C. Cir. 1996) .................................................13

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ......................................................13

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)................................................................8

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).......................................................................2, 13

*Nanji v. Nat'l Geographic Soc.*, 403 F. Supp. 2d 425 (D. Md. 2005) .............................................9

*Newton v. Nat'l Broad. Co.*, 930 F.2d 662 (9th Cir. 1990) ...........................................................16

*OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005).............................15

*Parisi v. Sinclair*, 845 F. Supp. 2d 215 (D.D.C. 2012)............................................16, 17

*Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012) ..................................................14

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) ............................15

*Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041 (4th Cir. 1986).........................................17

*Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309 (7th Cir. 1988).....................................16

*Sheppard v. CNN (In re CNN & Time Magazine "Operation Tailwind" Litig.)*,
    106 F. Supp. 2d 1000 (N.D. Cal. 2000) ...................................................................25

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018) ..............................................................9

*St. Amant v. Thompson,* 390 U.S. 727 (1968).................................................................13

*Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017) ........9

*Thomas v. L.A. Times Comm's*, 189 F. Supp. 2d 1005 (C.D. Cal. 2002) ......................11

*Va. Citizens Def. League v. Couric*, 910 F.3d 780 (4th Cir. 2018)...........................6, 7, 9

*Velocity Micro, Inc. v. J.A.Z. Mktg.*, 2012 WL 3017870 (E.D. Va. July 23, 2012).......20

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999)......................................................18, 19, 20

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) .............................10

*Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604 (E.D. Va. 2005) .......................................20

*X-Tra Art, Inc. v. Consumer Union*, 48 F.3d 1230, 1995 WL 100613 (9th Cir.
    1995) ..........................................................................................................................27

## STATE CASES

*Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133 (Ct. App. 2009) ................................ *passim*

*Childers v. San Jose Mercury Printing & Publ'g Co.*, 38 P. 903 (1894) ......................25

*Farr v. Bramblett*, 281 P.2d 372 (Cal. Dist. Ct. App. 1955) ..........................................24

*Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97 (Cal. 1986) (en banc).............................25

*Gomes v. Fried*, 186 Cal. Rptr. 605 (Ct. App. 1982)..................................................2, 25

*Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33 (Va. 1993) ............................................21

*Martinez v. Rodriguez*, 1995 WL 864098 (Cal. Super. Ct. Aug. 2, 1995) ....................................23

*McMillan v. McMillan*, 253 S.E.2d 662 (Va. 1979) ................................................................17, 19

*O'Hara v. Storer Commc'ns*, 282 Cal. Rptr. 712 (Ct. App. 1992) .........................................23, 24

*Verity v. USA Today*, 436 P.3d 653 (Idaho 2019) .........................................................................11

## OTHER AUTHORITIES

Cal. Civ. Code § 48a .............................................................................................. *passim*

Robert D. Sack, *Sack on Defamation* (5th ed. 2017) ...................................................................7, 9

The Oxford Dictionary of American Usage and Style (2000) ........................................................11

The Oxford Pocket Dictionary and Thesaurus (2006) ...................................................................11

Va. Code Ann. § 18.2-499 .............................................................................................................28

W. Prosser and W. Keeton, *The Law of Torts* § 111 (5th ed. 1984)...............................................9

## INTRODUCTION

This is one of a series of libel actions brought against the press by California Congressman Devin Nunes in the past year—the fifth in Virginia alone.  This one, seeking more than $250 million in damages, is against the Washington Post and one of its reporters, Shane Harris.

Full of overheated rhetoric, the Complaint in this case may strike the Congressman's supporters as an effective political statement, but as a statement of a legal claim it is nothing short of frivolous.  In its first, attention-grabbing paragraph, the Complaint accuses Post owner Jeff Bezos of having purchased the newspaper in 2013 "for the purpose of using [its] mighty pen to influence Federal elections" and "remain[ing] desperate to defame the President of the United States and his allies in Congress."  Compl. ¶ 1.  The Complaint proceeds to call Harris a "well-known . . . puppet of the FBI and CIA."  *Id.* ¶ 10.  But the only way it can even purport to state a libel claim is by mischaracterizing what the Post reported about Rep. Nunes.

The Complaint concerns a February 20, 2020, Post article entitled "Senior intelligence official told lawmakers that Russia wants to see Trump reelected."  *Id. ¶* 3.  The Article reported that President Trump was angered by an intelligence briefing given to members of the House Intelligence Committee to the effect that Russia wanted Trump to prevail in the upcoming 2020 election—a briefing the President had learned about from Rep. Nunes.  The Complaint alleges that the Post defamed Nunes by reporting that he "told President Trump that . . . Shelby Pierson had given the assessment . . . '*exclusively to Rep. Adam B. Schiff* (D-Calif.), the Chairman of the House Intelligence Committee.'"  *Id. ¶* 4 (emphasis added).  But the Post said no such thing.  The Post merely stated that "Trump *erroneously believed* that Pierson had given the assessment exclusively to Rep. Adam B. Schiff (D-Calif.), the Chairman of the House Intelligence Committee."  The Complaint fails to identify any defamatory statement in the four corners of the Article itself.

Fairly construed, the claim here is that the Post *implied* "that Plaintiff lied to . . . the President" by telling him that the briefing had been given exclusively to Rep. Schiff.  *Id.* ¶ 5.  That claim fails for several reasons:

1.      The law is clear in a case like this that a publisher is not liable for a defamatory implication or inference unless there is "affirmative" evidence on the face of the publication that the publisher "intend[ed] or endorse[d]" the defamatory inference.  *Chapin v. Knight-Ridder, Inc.,* 993 F.2d 1087, 1093 (4th Cir. 1993).  Here, there is nothing in the Article to suggest that the Post intended to accuse Rep. Nunes of lying to the President.

2.      The law is also clear that because he is a public official, Rep. Nunes must plausibly allege that the Post published a defamatory falsehood with "actual malice"—that is, with "knowledge that [the Article] was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (internal quotation marks omitted).  The Complaint purports to claim actual malice, but its allegations to that effect are wholly inadequate under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

3.      The Complaint fails to allege compliance with the California Retraction Statute, which is applicable because Rep. Nunes is domiciled in California.  That statute requires a defamation plaintiff to serve a retraction demand in writing within 20 days of learning of an allegedly defamatory report.  *See* Cal. Civ. Code § 48a.  Failure to serve a timely demand for retraction limits the plaintiff to "special damages"—that is, actual "economic loss."  *See id.*; *Gomes v. Fried*, 186 Cal. Rptr. 605, 614 (Ct. App. 1982).  Because the Complaint fails to plead special damages with the specificity that is required, it must be dismissed for that reason as well.  *See, e.g.*, *King v. Am. Broad. Cos., Inc.*, 1998 WL 665141, at *3 (S.D.N.Y. Sept. 28, 1998); *Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133, 165 (Ct. App. 2009); Fed. R Civ. P. 9(g).

The Complaint has a separate claim alleging that the Post conspired with House Democrats to defame Rep. Nunes. That claim fails for all of the same reasons as the straightforward libel claim, and for the additional reason that its allegations of a conspiracy are wholly conclusory and, therefore, inadequate under *Iqbal*.

For these reasons, more fully stated below, the Complaint should be dismissed with prejudice.[1]

## BACKGROUND

### A.    Representative Nunes

Rep. Nunes is a Republican Congressman from California who has served in the U.S. House of Representatives since 2003. Compl. ¶ 8. He currently represents "California's 22nd Congressional District, which is located in the San Joaquin Valley and includes portions of Tulare and Fresno Counties." *Id.* He also serves as the Ranking Member of the House Permanent Select Committee on Intelligence, commonly known as the House Intelligence Committee, and previously served as its chairman. *Id.* In his capacity as a Committee member, he "participates in oversight of the U.S. national security apparatus." *Id.*

Rep. Nunes is a frequent defamation litigant. With his counsel here, he has brought numerous defamation lawsuits, including four others in Virginia courts in the past year.[2]

---

[1] The Post is concurrently filing a Motion to Transfer to the District Court for the District of Columbia because the case has nothing to do with the Eastern District of Virginia.

[2] *See Nunes v. McClatchy Co. et al.*, No. CL-19-629 (Va. Cir. Ct. Albermarle Cty.); *Nunes v. Twitter, Inc. et al*, No. CL-19-1715 (Va. Cir. Ct. Henrico Cty.); *Nunes v. Fusion GPS A/K/A Bean LLC*, No. 19-cv-01148 (E.D. Va.); *Nunes v. Cable News Network, Inc.*, No. 19-cv-00889 (E.D. Va.); *see also Nunes v. Lizza et al.*, No. 19-cv-04064 (N.D. Ill.); *Devin Nunes Campaign Committee v. Seeley, et al.*, No. 279766 (Cal. Sup. Ct. Tulare Cty.). The case against Fusion GPS was recently dismissed. *See* Order, No. 19-cv-01148 (E.D. Va. Feb. 21, 2020), ECF No. 34 ("[T]he Amended Complaint includes many statements of law and conclusory allegations which falls short of satisfying the pleading standard per *Bell Atlantic v. Twombly*, 550 U.S. 544, 550 (2007).").  Less than two weeks before this case was filed, his counsel in this case was warned about filing

### B.     The Post Article

On February 20, 2020, the Post published an article entitled "Senior intelligence official told lawmakers that Russia wants to see Trump reelected."  Compl. ¶ 3; *see also* Ex. A ("the Article").[3]  The Article reported that a senior U.S. intelligence official, Shelby Pierson, had advised lawmakers from the House Intelligence Committee that "Russia "wants to see President Trump reelected, viewing his administration as more favorable to the Kremlin's interests."  Ex. A.  The briefing was provided during a classified hearing on "election security and foreign interference in the run-up to the 2020 election."  *Id.*  According to a committee official, the hearing was open to all members of the Committee, "including ranking member Nunes."  *Id.*  The Article did not identify the specific date of the hearing, *see id.*, but the Complaint alleges that it occurred on February 13, 2020, Compl. ¶ 4.

The Article reported that President Trump "learned about Pierson's remarks from Rep. Devin Nunes (Calif.), the committee's ranking Republican and a staunch Trump ally."  Ex. A.  After learning of the analysis, the Article stated, "Trump grew angry at his acting director of national intelligence, Joseph Maguire, in the Oval Office, seeing Maguire and his staff as disloyal for speaking to Congress about Russia's perceived preference."  *Id.*  President Trump confronted Maguire, and asked him why "he had to learn of what Pierson had said from Nunes and not from his own aides."  *Id.*  Citing officials "familiar with the matter," the Article stated that "[t]he

---

"inappropriate pleadings" in a libel case against the Post and others that was dismissed.  *See Lokhova v. Halper*, 2020 WL 963032, at *18 (E.D. Va. Feb. 27, 2020) ("[S]hould Biss file further inappropriate pleadings or pursue frivolous post-judgment litigation against any of these defendants [including the Post], sanctions might well be justified.")

[3] A copy of the online version of the subject article is attached as Exhibit A (which includes a version with images as it appears online, followed by a text-only version).  The Article also ran in print on February 21, 2020, under the headline "Election warning fells spy chief." A copy of the print article is attached as Exhibit B.

intelligence official's analysis and the President's furious response ruined Maguire's chances of becoming the permanent intelligence chief." *Id.*  On Wednesday, February 19, the Article reported, President Trump announced that he was replacing Maguire as acting intelligence chief with Richard Grenell, a "vocal loyalist" who was the ambassador to Germany. *Id.*

In its tenth paragraph, the Article reported that "Trump erroneously believed that Pierson had given the assessment exclusively to Rep. Adam B. Schiff (D-Calif.), the chairman of the House Intelligence Committee," according to "people familiar with the matter." *Id.*  The article did not say how Trump had arrived at that belief.

### C.    The Complaint

The Complaint contains two counts: one claiming that the Post and Harris defamed Nunes, and a second claiming that they conspired with House Democrats to defame him.[4]  The Complaint purports to identify two "misrepresentations" by the Post.  *First*, it alleges that the Post reported that "Devin Nunes told President Trump that Shelby Pierson had given the assessment . . . '*exclusively to Rep. Adam B. Schiff* (D-Calif.), the chairman of the House Intelligence Committee.'" Compl. ¶ 4 (emphasis added).  Only the words in single quotes appeared in the Post Article—as part of a sentence reporting that "Trump *erroneously believed* that Pierson had given the assessment exclusively to Rep. Adam B. Schiff (D.-Calif.), the chairman of the House Intelligence Committee." *See* Ex. A (emphasis added).  The Complaint does not allege that the sentence was false—only that "Devin Nunes never told the President or anyone else that Shelby Pierson had given an *exclusive* briefing to Schiff." Compl. ¶ 4 (emphasis added).  "The defamatory gist" of the Article, the Complaint alleges, "is that Plaintiff lied to and deceived the President of the United States" by telling him that the briefing was an exclusive one. *Id.* ¶ 5.

---

[4] Harris has not been served with the Complaint.

*Second*, the Complaint complains of the Post's statement that "Trump's opinion [of acting Director of Intelligence Maguire] shifted last week when he heard from a Republican ally about the official's remarks." *Id.* ¶ 4 (quoting the Article). The Complaint alleges that "Devin Nunes did not say or do anything to 'ruin' Maguire's chances of becoming the *permanent* intelligence chief," and that Maguire's term as *acting* chief was "due to expire pursuant to Federal Law on March 11. 2020." *Id.* (emphasis added). Notably, however, the Complaint does not challenge as false the Article's statements that President Trump "[saw] Maguire and his staff as disloyal for speaking to Congress about Russia's perceived preference," that Trump "said that Maguire should not have let the Capitol Hill briefing happen — particularly before he received the briefing," and that the President "gave Maguire a 'dressing-down.'" *See* Ex. A.

The Complaint does not allege that Rep. Nunes ever served the Post or Harris with a written request for a retraction, nor does it identify any special damages he is alleged to have suffered. It nevertheless demands $250 million in compensatory damages and $350,000 in punitive damages. Compl. ¶¶ 23, 29; *id*. at 23.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The plaintiff's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Legal conclusions "couched as [ ] factual allegation[s]" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Iqbal*, 556 U.S. at 678. If the facts alleged, taken as true for purposes of the motion, would not "state a claim to relief

that is plausible on its face," the complaint must be dismissed.  *Id.* (internal quotation marks omitted).

In recognition of the threat that defamation claims pose to free speech, "the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 89 (D.D.C. 2019) (alteration and internal quotation marks omitted).  Indeed, "the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern.  Where, as here, all of these considerations are present, the constitutional protection of the press reaches its apogee." *Chapin*, 993 F.2d at 1092.

"[B]ecause the defense of baseless defamation claims imposes an additional cost, in the form of potentially deterred speech, federal courts have historically given close scrutiny to pleadings in libel actions.  As a result, courts in Virginia and the Fourth Circuit routinely dismiss at the outset defamation claims that are based on constitutionally protected speech by media defendants." *Arthur v. Offit*, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010) (citation omitted). Indeed, defamation actions are particularly susceptible to early dismissal, because the "central event—the communication about which suit has been brought—is literally before the judge at the pleading stage.  2 Robert D. Sack, *Sack on Defamation* § 16.2.1, at 16-3 (5th ed. 2017).

## ARGUMENT

## I.    PLAINTIFF FAILS TO STATE A DEFAMATION CLAIM.

To state a claim for defamation, a plaintiff must allege (1) publication of (2) a false and defamatory statement, (3) that is "of and concerning" the plaintiff, (4) with the requisite fault.  *Va. Citizens Def. League*, 910 F.3d at 783.  Rep. Nunes fails to state a claim for defamation for at least three independent reasons.

7

*First*, he does not identify a single actionable false and defamatory statement.  His case rests on a theory of defamation-by-implication, but he fails to make the "rigorous showing" that is constitutionally required in such cases.  *Second*, he fails plausibly to allege that the Post published the Article with actual malice.  *Third*, he does not (and cannot in good faith) allege that he complied with the California retraction statute, Cal. Civ. Code § 48a, and he has failed specifically to plead the special damages to which he is limited as a result.[5]

### A.   Plaintiff Has Not Alleged a False and Defamatory Statement or Implication.

If is fundamental that the Plaintiff must identify something in the Article that is "not only false, but also defamatory." *Chapin*, 993 F.2d 1092.  "[A] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991).  "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified." *Id.* (internal quotation marks omitted); *accord Moldea v. N.Y. Times Co.*, 22 F.3d 310, 312 (D.C. Cir. 1994) (a "substantially true" statement is "not actionable in defamation").  As a result, "[t]he falsity of a statement and the defamatory 'sting' of the publication must coincide—that is, where the alleged defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Chapin*, 993 F.2d at 1092; *see also, e.g.*, *Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522, 532 (E.D. Va. 2007) ("minor or irrelevant inaccuracies will not render a statement materially false"), *aff'd*, 532 F.3d

---

[5] The choice of law analysis in this case is somewhat complicated because the Supreme Court of Virginia has yet to address how Virginia's *lex loci delicti* choice of law principles should apply where, as here, "the defamatory content [wa]s 'published' in multiple jurisdictions . . . on a website that can be accessed worldwide." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 664 (W.D. Va. 2019). For purposes of this motion, the only issue that is affected by a choice of law is the effect of Plaintiff's failure to request a retraction.  Choice of law is, therefore, discussed with the retraction argument, *see infra* Section I(C)(1).

312 (4th Cir. 2008).[6]  And "[w]here the question of truth or falsity is a close one, a court should err on the side of nonactionability."  *Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 158 (D.D.C. 2018) (brackets and internal quotation marks omitted) (granting motion to dismiss).

An actionable statement must also be defamatory.  Defamatory words are those that rise to the level of making "the plaintiff appear odious, infamous, or ridiculous."  *Chapin*, 993 F.2d at 1092 (internal quotation marks omitted); *see also, e.g.*, *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (per curiam) ("An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous.") (internal quotation marks omitted), *cert denied*, 139 S.Ct 459 (2018).  "There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing . . . is not actionable."  1 Robert D. Sack, *Sack on Defamation* § 2.4.1 (5th ed. 2017).  Rather, defamation "necessarily . . . involves the idea of disgrace."  W. Prosser and W. Keeton, *The Law of Torts* § 111, at 773 (5th ed. 1984); *see also Va. Citizens Def. League*, 910 F.3d at 783–84.

The law at the pleadings stage is particularly demanding where, as here, the plaintiff's claim is based not on what is explicitly stated, but rather on what is allegedly implied by an otherwise truthful account.  *Chapin*, 993 F.2d at 1092.  The Fourth Circuit has held that in such cases, the First Amendment requires that the plaintiff must "make an especially rigorous showing."  *Id.*  The plaintiff must show not only that the defamatory meaning can be "reasonably" inferred

---

[6] *See also, e.g.*, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("[W]hen falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false.  In particular, several courts of appeals have affirmed dismissals of defamation claims because the material in the complaint cannot be reasonably understood except as being true or substantially true.") (citations omitted) (citing cases); *Nanji v. Nat'l Geographic Soc.*, 403 F. Supp. 2d 425, 431 (D. Md. 2005) (dismissing complaint where the "gist of [the defendant's] published statement is substantially true").

from the publication, but also that the publication "affirmatively suggest[s] that the author intend[ed] or endors[ed] the inference." *Id.* at 1092; *see also, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (the publication must on its face supply "additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference"); *Dodds v. Am. Broad. Co., Inc.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (plaintiff must establish that the defendant "intended to convey the defamatory implication" in addition to showing that "this implication was reasonable"). "Without a clear signal" from the face of the publication "that [the defendant] endorsed the inference," a defamation-by-implication claim must be dismissed. *Jenkins v. Snyder*, 2001 WL 755818, *5 (E.D. Va. Feb. 6, 2001).

Here, Rep. Nunes does not challenge the substantial truth of any specific statement in the Article. Instead, he alleges that the Article defamed him by *implying* that he "lied to and deceived the President of the United States" by telling the President that a senior intelligence official had given an "exclusive" briefing to Rep. Adam Schiff. Compl. ¶¶ 4–5. The Article, of course, contains no such statement. It reports that "*Trump erroneously believed* that Pierson had given the assessment exclusively to Rep. Adam B. Schiff." Ex. A (emphasis added). But the Article does not say how Trump arrived at that mistaken belief. In the absence of any other explanation, the reasonable assumption is that there was a simple misunderstanding or miscommunication.

The Article certainly does not include anything that "affirmatively suggest[s] that the [Post] intend[ed] or endors[ed] the inference" that Rep. Nunes "lied" to the President. *Chapin*, 993 F.2d at 1092; *see also, e.g.*, *White*, 909 F.2d at 520.[7] There is no "clear signal" in the Article that the

---

[7] The alleged implication that Rep. Nunes "lied" to the President is the "defamatory gist" that Plaintiff claims. Compl. ¶ 5. If there was a mere miscommunication that led to the President's mistaken belief, that would not subject Rep. Nunes to the shame or disgrace necessary to support a libel claim.

Post intended to accuse Rep. Nunes of deliberately deceiving the President about who was present at the briefing. *Jenkins*, 2001 WL 755818, at *5. To the contrary, Rep. Nunes is described as a "staunch Trump ally." Ex. A. "Staunch," of course, means "*trustworthy*; loyal." *See Staunch*, The Oxford Pocket Dictionary and Thesaurus 817 (2006) (emphasis added); *Staunch*, The Oxford Dictionary of American Usage and Style 316 (2000) (same). It does not make any sense that Trump's "trustworthy" ally would lie to him about matters pertaining to his Committee. In short, the alleged implication here ignores "the plain and natural meaning of the words used." *Chapin*, 993 F.2d at 1092; *see, e.g.*, *Jenkins*, 2001 WL 755818, at *5 (court cannot "stretch the meaning of the words" in the challenged publication).[8]

The Complaint might also be read to allege that the Article implied that Rep. Nunes deliberately set out "to ruin Maguire's chances of becoming the permanent intelligence chief." Compl. ¶ 4. It claims that the Post was guilty of a "misrepresentation" when it reported (accurately) that "Trump's opinion [of Acting Director of Intelligence Maguire] shifted when he heard from a Republican ally about the official's remarks." *Id.* ¶ 4 (quoting the Article). That statement, of course, is not itself defamatory of Rep. Nunes, even if it were false. The "truth," the Complaint alleges, is that "Devin Nunes did not say or do anything to 'ruin' Maguire's chances of becoming permanent intelligence chief." *Id.* But the Article does not state or imply that Nunes sought to ruin Maguire's chances—or even that any misunderstanding about who was present for

---

[8] Other courts have found an insufficient basis in the language of a publication to support a claim that the publication implied the plaintiff had lied. *E.g.*, *Thomas v. L.A. Times Comm's*, 189 F. Supp. 2d 1005, 1014 (C.D. Cal. 2002) (insufficient affirmative evidence that defendant publisher intended to convey that plaintiff lied, even where "the article does suggest that [the defendant] is skeptical" about the plaintiff's account), *aff'd*, 45 F. Appx. 801 (9th Cir. 2002); *Verity v. USA Today*, 436 P.3d 653, 669 (Idaho 2019) (insufficient affirmative evidence that publisher intended to convey that plaintiff teacher had "deceived Idaho officials by hiding his past," including an inappropriate relationship with a student and subsequent revocation of his Oregon teaching license, where article "focus[ed] blame on state reporting systems," rather than on the teacher).

the briefing ruined Maguire's chances.  The Article explains that it was "*[t]he intelligence official's analysis* and Trump's furious response [that] ruined Maguire's chances of becoming the permanent intelligence chief."  Ex. A (emphasis added).  And there is no suggestion in the Article that Rep. Nunes mischaracterized the substance of the intelligence official's analysis that Russia wanted Trump to be reelected.  There is certainly no "affirmative" indication in the Article to suggest that the Post intended to imply that Rep. Nunes was seeking to ruin Maguire's chances.  *See Chapin*, 993 F.2d at 1092.

Moreover, even if the Article had suggested that Rep. Nunes had tried to prevent Maguire from becoming the permanent intelligence chief, that would not be defamatory.  There is nothing disgraceful in general about a political figure trying to block or promote a candidate for appointed office.  To the contrary, that is a rather ordinary part of our political system, especially for a position like the Director of National Intelligence that is subject to confirmation by the Senate.[9]

Because the Complaint fails to allege any false and defamatory statement or implication, it must be dismissed.  *See, e.g.*, *id.*; *Jenkins*, 2001 WL 755818, at *5.

### B.    Plaintiff Has Not Plausibly Alleged Actual Malice.

"To encourage and facilitate debate over matters of public concern, the Supreme Court has held that the First Amendment protects, among other things, discussion about public officials and public figures."  *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 113 (D.C. Cir. 2017) (Kavanaugh, J.).  A public official or figure cannot prevail in a defamation action unless he pleads and proves that the defendant published the false and defamatory statements with "actual malice—

---

[9] For the same reasons, setting aside the implausible implication that Rep. Nunes intentionally deceived President Trump, the mere statement that "Trump learned about Pierson's remarks from Rep. Devin Nunes," Ex. A, is not itself defamatory.  It is not disgraceful for Rep. Nunes to report to the President on matters pertaining to his Committee.

that is, with knowledge that it was false, or with reckless disregard of whether it was false or not." *N.Y. Times Co.*, 376 U.S. at 280.  "Mere negligence does not suffice."  *Masson*, 501 U.S. at 510. "Reckless disregard" requires proof that the defendant "in fact entertained serious doubts as to the truth" of the publication—that it had a "high degree of probable falsity."  *Bose Corp. v. Consumers Union,* 466 U.S. 485, 511 (1984) (internal quotation marks omitted); *St. Amant v. Thompson,* 390 U.S. 727, 731–732 (1968); *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964).

This is a deliberately "daunting" standard, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), that "embodies our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks' on public figures," *Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at *3 (E.D. Va. Apr. 25, 2012) (quoting *New York Times Co.*, 376 U.S. at 270).  Courts in this Circuit and across the country routinely dismiss cases for failure to plead sufficient facts plausibly to support an inference of actual malice.  *See, e.g.*, *Mayfield v. NASCAR*, 674 F.3d 369, 378–79 (4th Cir. 2012); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *Besen*, 2012 WL 1440183, at *6; *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 92–93 (D.D.C. 2018).  Indeed, "application of the plausibility pleading standard makes particular sense when examining public figure defamation suits," because "[f]orcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent." *Michel*, 816 F.3d at 702.[10]

---

[10] Rep. Nunes is a public official who must plead actual malice.  Whether a plaintiff qualifies as a public figure or public official is a "question of law for the court to decide."  *Besen*, 2012 WL 1440183, at *3.  But here, there is no serious question that a prominent Congressman like Rep. Nunes qualifies.  Indeed, Rep. Nunes has admitted in other defamation cases that he is a public

Rep. Nunes's Complaint falls well short of this "daunting" standard.  The Complaint offers little more than conclusory allegations as to the Post's subjective understanding of the facts.  *See e.g.*, Compl. ¶ 3 (the Article "was manufactured out of whole cloth"), *id.* ¶ 21 ("WaPo and Harris made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false."); ¶ 21(f) ("The words chosen by WaPo and Harris, and their accusation that Plaintiff intended to harm Maguire, which is categorically false, evince their ill-will, spite and actual malice.").  But "[t]his kind of conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected."  *Mayfield*, 674 F.3d at 378; *see also Iqbal*, 556 U.S. at 678; *Fairbanks*, 314 F. Supp. 3d at 92–93; *Arpaio*, 414 F. Supp. 3d at 91.

While the Complaint alleges that the Post acted with "institutional hostility, hatred, extreme bias, spite and ill-will towards Plaintiff, the GOP, and President Trump," *e.g.*, Compl. ¶ 21(g), these allegations are also conclusory, *Iqbal*, 556 U.S. at 678, and do not support a claim of actual malice in any event.  "[C]aselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice."  *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C. 2012) (citing cases); *see also, e.g.*, *Arpaio*, 414 F. Supp. 3d at 92 ("Even assuming the alleged 'leftist enmity' is real, the motivations behind defendants' communications—inspired by political differences or otherwise—do not impact whether defendants acted with actual malice as a matter of law."); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) (a newspaper's "motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice").

---

figure.  *See, e.g.*, Plaintiff's Resistance and Memorandum in Opposition to Defendants' Motion to Dismiss, *Nunes v. Lizza*, No. 19-cv-4064 (N.D. Ia. Mar. 3, 2020), ECF No. 38, at 1.

The same is true of Plaintiff's bare claims that the Post "abandoned all journalistic standards and integrity" and "did not seek the truth or report it."  *See, e.g.*, Compl. ¶ 21(d).  Once again, these are "naked assertions" and "conclusory statements" lacking any factual allegations for support.  *Iqbal*, 556 U.S. at 678.  And, in any event, they cannot establish actual malice, because the test requires "more than an extreme departure from professional standards."  *Harte-Hanks*, 491 U.S. at 665 (emphasis added); *see also, e.g.*, *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 55 (D.D.C. 2005) (holding that ethical or professional breaches cannot "bear on the defendant's subjective knowledge of the falsity of the . . . allegations in the article"); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("[F]ailure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth.").

The only specific fact that Rep. Nunes alleges about the Post's subjective knowledge is clearly insufficient to establish actual malice.  He contends that the Post had "unambiguous evidence of falsity" because the Post allegedly knew he "was in Tulsa on February 14, 2020."  Compl. ¶ 21(e); *see also id.* ¶ 4 ("WaPo and Harris knew that Devin Nunes was in Tulsa, Oklahoma, on February 14, 2020 for a breakfast hosted by the Republican Party of Tulsa County.").  But this fact does not conflict in any way with the facts the Post reported in the Article.  The Article does not report *when* President Trump learned of the briefing from Rep. Nunes (or how).  Ex. A.  And although Rep. Nunes may have been in a breakfast in Tulsa on February 14, 2020, he could have conveyed the information to President Trump on a different day, or via some form of communication other than a face-to-face meeting, such as an email, letter, text message, or liaison between staff.  In short, there is no inconsistency between what Rep. Nunes alleges and what the Post reported.  Indeed, it is striking that Rep. Nunes does *not* allege that he did not tell

President Trump about the briefing—Plaintiff alleges only that he "never conveyed to him any indication that Schiff was given an *exclusive* assessment."  Compl. ¶ 4 (emphasis added).  In short, there is no basis for any claim that the Post knew that anything it reported in the Article was false or probably false.

There is certainly no allegation that the Post knew that its Article would be construed to mean that Rep. Nunes had "lied" to the President about who was present for the briefing.  And in a case of libel by implication, the defendant cannot be found to have acted with actual malice unless it knew that the publication contained the alleged implication in the first place.  *See, e.g., Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 680 (9th Cir. 1990) (holding that, because actual malice is a "deliberately subjective" test, liability cannot be imposed for an implication that merely "should have been foreseen"); *Howard v. Antilla*, 294 F.3d 244, 254 (1st Cir. 2002) (same); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988) ("Not only must the plaintiff establish that the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity, but also that the defendants intended to imply or were reckless toward the implications").

Finally, it bears noting that Rep. Nunes declined the opportunity to provide his own version of these events to the Post.  As the Post reported, "[a] spokesman for Nunes did not respond to requests for comment."  Ex. A.  While Rep. Nunes surely had no obligation to speak to the Post, the Post's effort to secure comment from him underscores its desire to report the truth, just as Nunes's refusal to comment undermines his effort to show that the Post acted with actual malice.  *See, e.g.*, *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 219 (D.D.C. 2012) (granting motion to dismiss on actual malice grounds where complaint failed to plausibly allege reckless disregard for the truth, and emphasizing that the journalist contacted plaintiff for comment, but received no response).

16

Because the Complaint fails plausibly to allege actual malice, it must be dismissed.  *Id.*;

*Mayfield*, 674 F.3d at 378; *Besen*, 2012 WL 1440183, at *3.

### C.   The Defamation Claim Must Also Be Dismissed Because of Plaintiff's Failure to Comply with the California Retraction Statute.

Even if they were not otherwise deficient, Rep. Nunes's claims would be barred by the

California retraction statute, Cal. Civ. Code § 48a.  Rep. Nunes does not allege that he complied

with that statute, and he has failed to plead with specificity the special damages to which he is

limited as a result.

### 1.   The Case is Governed by the Law of Rep. Nunes's Home State, California.

A federal district court sitting in diversity applies the conflicts rule of the forum state to

determine which state's law will govern the action.  *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041,

1044 (4th Cir. 1986).  If the forum state's law is unsettled, then the district court must "predict

how the state's highest court would rule on [the] unsettled issue."  *Horace Mann Ins. v. Gen. Star*

*Nat'l Ins.*, 514 F.3d 327, 329 (4th Cir. 2008).  Here the best prediction is that the law of Rep.

Nunes's home state, California, would apply.[11]

The Virginia Supreme Court "has consistently held that it is the place of the wrong (*lex*

*loci delicti*) that determines which State's substantive law applies in a tort action brought in

Virginia."  *Quillen*, 789 F.2d at 1044 (citing *McMillan v. McMillan*, 253 S.E.2d 662 (Va. 1979)).

Generally speaking, the operative state law is that of "the place where the last event necessary to

make an act liable for an alleged tort takes place."  *Id.* (internal quotation marks omitted).  But that

rule  provides  little  guidance  where,  as  here,  a  communication  is  published  to  readers

---

[11] As described *supra* n.5, the court need not reach this issue if the Motion is resolved on other grounds.  There is no choice of law conflict that is relevant to the Motion except for the retraction statute.  Neither Washington, D.C. nor Virginia have retraction statutes.

simultaneously in 50 states.  As the Fourth Circuit recognized in a case involving Maryland law and a nationally syndicated radio show, "application of the traditional *lex loci delicti* rule becomes cumbersome, if not completely impractical" in multistate defamation cases involving the simultaneous publication of statements across different jurisdictions.  *Wells v. Liddy*, 186 F.3d 505, 527 (4th Cir. 1999).

"The Supreme Court of Virginia has yet to address how the 'place of the wrong' should be defined in 'situations where the defamatory content is published in multiple jurisdictions.'" *Gilmore v. Jones*, 370 F. Supp. 3d 630, 645 (W.D. Va. 2019) (quoting *Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*, 2017 WL 2385343, at *3, n.2 (E.D. Va. June 1, 2017)). For that reason, unless the case is dismissed on other grounds, this Court must predict what law the Virginia Supreme Court would apply in this multi-jurisdiction defamation suit.[12]

The prevailing view, adopted by multiple federal courts, is that the Virginia Supreme Court would apply the law of the state of the plaintiff's injury, which is generally plaintiff's domicile (in this case, California).  *See, e.g.*, *Gilmore*, 370 F. Supp. 3d at 666; *Hatfill v. Foster*, 415 F. Supp. 2d 353, 365 (S.D.N.Y. 2006).  For example, in a recent multi-state Internet defamation case, the U.S. District Court for the Western District of Virginia concluded that the Virginia Supreme Court would apply the law of "the state where the plaintiff is primarily injured as a result of the allegedly tortious online content."  *Gilmore*, 370 F. Supp. 3d at 666.  Thus, while the publication at issue was available worldwide through the Internet, the court held that the "state where the plaintiff [was] primarily injured" was Virginia, where he lived and worked.  *Id.*  Likewise, applying Virginia choice-of-law principles, a district court in the Southern District of New York reached the same conclusion in another defamation action involving a nationwide magazine publication.

---

[12] Plaintiff alleges that the Post is a multistate publication.  Compl. ¶ 9.

*See Hatfill v. Foster*, 415 F. Supp. 2d at 365.  In that case, the court held that Virginia would apply

the law of the state "where the plaintiff suffered the greatest injury," which is "where the plaintiff

was domiciled, absent strong countervailing circumstances."  *Id.* at 364–65 (explaining that this is

how the "vast majority" of *lex loci* jurisdictions resolve the issue); *see also Ascend Health Corp.*

*v. Wells*, 2013 WL 1010589, at *2 (E.D.N.C. Mar. 14, 2013) (applying the similar *lex loci* rule of

North Carolina and holding that the site of plaintiffs' injury would control in multistate Internet

defamation case); *Adventure Outdoors, Inc. v. Bloomberg*, 2007 WL 9735875, at *3 (N.D. Ga.

Dec. 18, 2007) (endorsing *Hatfill v. Foster* and determining in a multistate case that "the place

where the injury occurred" was where the plaintiff was domiciled); *Hudson Assocs. Consulting,*

*Inc. v. Weidner*, 2010 WL 1980291, at *6 (D. Kan. May 18, 2010) (applying the law of the

plaintiff's domicile in multistate case).

There are three reasons why this is the correct result.  *First*, applying the law of the place

of injury is most consistent with "the underlying rationale" of the *lex loci* rule, which the Virginia

Supreme Court has held to be "uniformity, predictability, and ease of application."  *Gilmore*, 370

F. Supp. 3d at 664 (quoting *McMillan*, 253 S.E.2d at 665).  "The traditional *lex loci delicti* rule

'presumes that the defamatory statement is published (i.e., communicated to third parties) in one

geographic location,' but publication via the Internet results in instantaneous 'multistate (if not[ ]

worldwide) publication.'"  *Id.* (alteration in original) (quoting *Ascend Health Corp.*, 2013 WL

1010589, at *2).  As a result, "defining the 'place of the wrong' as the place of publication in cases

like this"—with reports published online and across the nation, and even frequently involving

contributions from journalists in multiple jurisdictions—"would inevitably require the

cumbersome application of a patchwork of state law," which is neither uniform nor predictable.

*Id.*; *see also, e.g.*, *Wells*, 186 F.3d at 528 ("multistate defamation is a tort for which the *lex loci*

*delicti* rule fails to reach a satisfactory result"). In short, it would be unreasonable to assume that the Virginia Supreme Court would adopt an interpretation that defeats what it has held to be the very purpose of the rule.

*Second*, "defining the 'place of the wrong' as the place of publication in a case like this raises thorny questions about the nature of online publication," and specifically about where the "publication" technically occurs. *Gilmore*, 370 F. Supp. 3d at 665. Courts are increasingly at odds and "unclear whether 'publication' of online content occurs in the state where an individual uploads content, the state where the relevant media platform or publication maintains headquarters, the state where a website's servers are located, or the state where third parties actually view the content (which, absent restrictions on the geographic reach of a particular online publication, will be in all fifty states and across the world)." *Id.* This has led to inconsistent results even within this district. *See, e.g.*, *id.* (citing several cases, including *Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 608 (E.D. Va. 2005) (place of publication is "corporate headquarters" of company controlling website); *Velocity Micro, Inc. v. J.A.Z. Mktg.*, 2012 WL 3017870, at *6 (E.D. Va. July 23, 2012) (place of publication is the "place where the [allegedly defamatory] email was opened and read")).

*Third*, further underscoring how "completely impractical" the application of the traditional rule would be in a multi-state defamation case, *see Wells*, 186 F.3d at 527, these questions often go beyond the scope of information included in a complaint. This reality further counsels in favor of the law of the place of injury. For example, in some cases courts have been forced to assume where the publication occurred. *See, e.g.*, *Velocity*, 2012 WL 3017870, at *6 (assuming that email to Minnesota corporation was opened and therefore published in Minnesota). In other cases, courts have applied Virginia law by default because the answer appeared unknowable. *See, e.g.*, *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 670 (E.D. Va. 2019) (applying

Virginia law where "[a]gents of WikiLeaks could have posted the DNC's information from countless locations around the world" such that the court could not "determine where the act of publication occurred based on the Amended Complaint"). In such situations, the *lex loci* goals of "uniformity" and "predictability" plainly are not achieved.

While in an invasion of privacy context the *Cockrum* court predicted last year—prior to *Gilmore*—that the Supreme Court of Virginia would define the "place of the wrong" to be "the place where the act of publication to the Internet occurred," *Id*. at 669–70, that interpretation conflicts with how the "vast majority" of *lex loci* jurisdictions have resolved the question, *Hatfill v. Foster*, 415 F. Supp. 2d at 364, and is wrong for each of the reasons discussed above. It is further premised on the incorrect proposition that looking to the site of injury would run afoul of the Virginia Supreme Court's prior rejection of the Second Restatement's "most significant relationship" test for choice of law. *See Cockrum*, 365 F. Supp. 3d at 669 (citing the wrongful death case of *Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993)). The *Gilmore* court explained why this supposed conflict was illusory: "[t]he Court *does not* hold that the Supreme Court of Virginia would apply the Second Restatement's 'most significant relationship' test, which provides that defamation cases should be decided under the law of the state with "the most significant relationship to the occurrence and the parties." 370 F. Supp. 3d at 665 n.37 (emphasis added). Instead, *Gilmore* applied "another variant of *lex loci delicti* that defines the 'place of the wrong' as the site of the plaintiff's injury.'" *Id.* As *Gilmore* makes clear, the tests are different; the "most significant relationship" test looks to the "most significant relationship *to the occurrence and the parties*," whereas the *lex loci* injury test looks *to the plaintiff*. *See id.* (emphasis added). The *Ascend Health* case similarly found that the North Carolina Supreme Court would apply a *lex loci* rule that would look to the site of the plaintiff's injury, while rejecting the "most significant

relationship" test. 2013 WL 1010589, at *2 (reasoning that the plaintiff's "reputational . . . harm is centered" where the plaintiff resided).[13]

In short, the best prediction of what the Virginia Supreme Court would hold is the one recently reaffirmed in *Gilmore*: defining "the place of the wrong" in a case like this as the state where "the plaintiff is injured." *Gilmore*, 370 F. Supp. 3d at 664; *Hatfill v. Foster*, 415 F. Supp. 2d at 365. This approach is the most consistent with "underlying values animating the Supreme Court of Virginia's approach to *lex loci delicti*." *Gilmore*, 370 F. Supp. 3d at 666. Once that determination is made, the rest of the choice of law analysis is indisputable. Rep. Nunes alleges that he is a California Congressman and citizen. Compl. ¶ 4. California, therefore, is the location of the greatest part of any alleged injury. *See, e.g.*, *Hatfill v. Foster*, 415 F. Supp. 2d at 365 (district where plaintiff was domiciled is presumptively the place of greatest harm); *see also, e.g.*, *Ascend*, 2013 WL 1010589, at *2. Accordingly, California law applies.

### 2. Rep. Nunes Failed to Comply with the California Retraction Statute.

Rep. Nunes failed to comply with California's retraction statute. Cal. Civ. Code § 48a. As a result, he is limited to seeking special damages.

Pursuant to the statute, "[i]n any action for damages for the publication of a libel in a daily or weekly news publication, or of a slander by radio broadcast," a defamation plaintiff "shall only recover special damages unless a correction is demanded and is not published or broadcast, as

---

[13] To the extent the trial court in *Nunes v. Twitter* applied *Cockrum* and suggested that the law of the "place of publication" to the Internet should apply, its brief analysis is unpersuasive for the same reasons that *Cockrum*'s analysis is unpersuasive. *See* 2019 WL 5549825, at *2 (Va. Cir. Ct. Oct. 2, 2019). Moreover, the court was not even undertaking a choice of law analysis, but rather was determining whether the cause of action arose "outside of Virginia" for purposes of *forum non conveniens*. The complaint alleged that the defendants were Virginia residents who had published the social media posts at issue in Virginia. *Id.* at *1–2. And, while the court noted that it was rejecting a "significant relationship" rule, it apparently did not consider the separate place of injury test adopted in *Gilmore*. *Id.* The court did not mention *Gilmore* or *Ascend*.

provided" by the statute.  *Id.*  Specifically, a plaintiff must "serve upon the publisher at the place of publication, or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that those statements be corrected." *Id.*  The "notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous." *Id.*  The communication must "specifically *demand* a retraction or correction," and must be "unequivocal." *Martinez v. Rodriguez*, 1995 WL 864098, at *2 (Cal. Super. Ct. Aug. 2, 1995); *O'Hara v. Storer Commc'ns*, 282 Cal. Rptr. 712, 718 (Ct. App. 1992) (demand cannot be "conditional").

"Whether [Plaintiff] met the requirements of the statute is a question of law." *See, e.g.*, *O'Hara*, 282 Cal. Rptr. at 717.  California law is clear that in the event a plaintiff fails to comply with the statute—and, indeed, plead compliance—the "individual cannot recover anything beyond special damages." *See, e.g.*, *Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133, 163 (Ct. App. 2009) (internal quotation marks omitted).

The retraction statute has teeth by design.  California adopted the statute to "to encourage a more active press by means of an increased insulation of [the press] from liability arising from erroneous published statements." *Id.* (internal quotation marks omitted).  It "represents a significant change from common law libel," and was part of a broader legislative trend "to restrict perceived excessive general damage awards and protect the public interest in the free dissemination of news." *Id.* (internal quotation marks omitted).

### a.  The Retraction Statute Applies to the Post's Article.

As a threshold matter, it is indisputable that the retraction statute reaches the Article at issue here.  The statute covers publications "either in print or electronic form, that contain[] news on matters of public concern and that publish[] at least once a week." Cal. Civ. Code § 48a.  The Post qualifies.

### b.       Rep. Nunes Did Not Comply with the Retraction Statute.

Rep. Nunes does not—and cannot—allege compliance with the statute.  The Complaint does not "plead" that he ever made any specific written retraction demand, much less within "20 days" as required by the statute's plain terms.  Cal. Civ. Code § 48a.  And it will be impossible for Rep. Nunes to correct this defect because he did not make any applicable written demand to the Post seeking retraction within the allotted time period.

Courts enforce the "plain language of the statute," and have made clear that failure to adhere to its precise requirements is fatal to a claim.  *See, e.g.*, *King*, 1998 WL 665141, at \*3–4 (dismissing complaint that failed to allege demand had been made "in writing"); *Anderson v. Hearst Publ'g Co.*, 120 F. Supp. 850, 853–54 (S.D. Cal. 1954) (dismissing complaint in which demand did not identify specific statements to be retracted, emphasizing that "[w]e cannot disregard the plain language of the California statute, Section 48a, Civil Code, that the plaintiff shall serve a written notice specifying the statements claimed to be libelous" (quotation marks omitted)); *see also, e.g.*, *Anschutz*, 90 Cal. Rptr. at 165 (demand that failed to identify plaintiff was insufficient); *O'Hara, Inc.*, 282 Cal. Rptr. at 718 ("conditional" retraction request was insufficient); *Farr v. Bramblett*, 281 P.2d 372, 377 (Cal. Dist. Ct. App. 1955) (letter inviting publisher to meeting to make retraction was insufficient), *disapproved of on other grounds by Field Research Corp. v. Superior Ct. of City & Cty. of S.F.*, 453 P.2d 747 (Cal. 1969).

### 3.       The Complaint Fails Plausibly to Allege Special Damages.

Because Rep. Nunes failed to comply with the retraction statute, he "shall only recover special damages."  Cal. Civ. Code § 48a.  Accordingly, "without an allegation of special damages, the complaint does not allege a legally sufficient cause of action, and it must be dismissed."  *King*, 1998 WL 665141, at \*4 (dismissing complaint).

24

Courts routinely dismiss complaints where, as here, the plaintiff has not complied with the retraction statute and has not alleged special damages with the requisite specificity. *See, e.g.*, *id.*; *Anderson*, 120 F. Supp. at 853–54 (dismissing complaint); *Sheppard v. CNN (In re CNN & Time Magazine "Operation Tailwind" Litig.*), 106 F. Supp. 2d 1000, 1001–02 (N.D. Cal. 2000) (dismissing claims for failure to "allege special damages with adequate specificity" where plaintiffs had "not alleged a sufficient demand for retraction"); *Anschutz*, 90 Cal. Rptr. 3d at 165 (granting Anti-SLAPP motion based on "insufficient pleading of a special damages claim" where plaintiff "never served a legally effective retraction demand"); *Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 101 (Cal. 1986) (en banc) (explaining that where a plaintiff's "complaint sought only general damages and did not allege that he had demanded a retraction, the [retraction] statute would have clearly barred a libel action").

Rep. Nunes's Complaint does not come close to alleging special damages, let alone with the requisite specificity. Whereas "general damages encompass the loss of reputation, shame and mortification and hurt feelings in any context, including the plaintiff's trade or business," "*special damages are defined narrowly to encompass only economic loss*." *Gomes v. Fried*, 186 Cal. Rptr. 605, 614 (Ct. App. 1982) (emphasis added and citations omitted); *see also Childers v. San Jose Mercury Printing & Publ'g Co.*, 38 P. 903, 904 (1894) ("Special damages, as a branch of actual damages, may be recovered when *actual pecuniary loss* has been sustained." (emphasis added)). In addition, special damages must be pleaded with specificity. *See, e.g.*, Fed. R. Civ. P. 9(g) (special damages must be "specifically stated"); *FAA v. Cooper*, 566 U.S. 284, 295 (2012) ("'Special damages' are limited to actual pecuniary loss, which must be specially pleaded and proved.").

25

Rep. Nunes makes only a generic allegation that he "suffered presumed damages and actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to his reputation, special damages, costs, and other out-of-pocket expenses, in the sum of $250,000,000 or such greater amount as is determined by the Jury."  Compl.  ¶ 23.  While the Complaint literally says the words "special damages," it fails to allege any specific economic loss, much less an "estimation of the amount of pecuniary loss suffered" "with the requisite particularity."  *Martin v. Wells Fargo Bank*, 2018 WL 6333688, at *2 (C.D. Cal. Jan. 18, 2018); *see also, e.g.*, *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, 2014 WL 6892141, at *4 (C.D. Cal. Nov. 5, 2014) ("Plaintiffs' general statements of economic loss and bare statement for relief of $3 million dollars in damages do not sufficiently identify special damages."); *Anschutz*, 90 Cal. Rptr. 3d at 165 (general allegations of damage to plaintiff's reputation was "insufficient to meet the specific pleading requirement" for special damages following failure to demand retraction); Fed. R. Civ. P. 9(g).

Because the Complaint lacks an adequate allegation of special damages, it "does not allege a legally sufficient cause of action under California law," and must be dismissed.  *King*, 1998 WL 665141, at *4; *In re Cable News Network*, 106 F. Supp. 2d at 1001–02; *Anderson*, 120 F. Supp. at 853–54.

## II.   PLAINTIFF FAILS TO STATE A CONSPIRACY CLAIM FOR ADDITIONAL REASONS.

The conspiracy claim must be dismissed along with the underlying defamation claim for the same reasons.  "Where the complaint is based on an offensive statement that is defamatory, plaintiffs have not been allowed to circumvent the statutory limitation[s] by proceeding on a theory

other than defamation."  *X-Tra Art, Inc. v. Consumer Union*, 48 F.3d 1230 (table), 1995 WL

100613, at *3 (9th Cir. 1995) (citing cases) (internal quotation marks omitted).[14]

Even apart from the retraction statute, the conspiracy allegations fail for the independent

reason that they are nothing more than "naked assertions devoid of factual enhancement" that do

not state a claim.  *Iqbal*, 556 U.S. at 678 (brackets and internal quotation marks omitted).  "Under

California law, a claim of civil conspiracy has three elements: (1) an agreement to commit

wrongful acts; (2) commission of the wrongful acts; and (3) damage resulting from commission

of the wrongful acts."  *Harper v. Lugbauer*, 2011 WL 6329870, at *5 (N.D. Cal. Nov. 29, 2011).

Here, Plaintiff alleges that "WaPo and its agents (including Harris), combined, associated,

agreed or acted in concert with House Democrats (including members of their staff or agents acting

within the scope of their authority and at their direction) for the express purpose of defaming and

injuring Plaintiff."  Compl. ¶ 26.  But the Complaint fails to state sufficient facts that could

plausibly establish that the Post entered into an agreement with "House Democrats" to commit

wrongful acts against Rep. Nunes.  This is textbook *Twombly*: "Without more, parallel conduct

does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point

does not supply facts adequate to show illegality."  *Twombly*, 550 U.S. at 556–57; *Cox v. MAG*

*Mut. Ins. Co.*, 2015 WL 1640513, at *6 (E.D. Va. Apr. 9, 2015) (dismissing conspiracy claim

where complaint "neither identifies nor details any sort of agreement between the defendants").

---

[14] For the reasons described *supra* Section I(C)(1), California law should apply to the tort claims
here.  But there is no conflict as to conspiracy, because the same principle would apply under
District of Columbia or Virginia law.  *See, e.g.*, *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C.
Cir. 2013) ("Because [Plaintiffs'] defamation claim fails, so do their other tort claims based upon
the same allegedly defamatory speech."); *Lokhova*, 2020 WL 963032, at *17 ("[W]here there is
no actionable claim for the underlying alleged wrong, plaintiff cannot maintain a claim for civil
conspiracy.") (brackets and internal quotation marks omitted).

Rep. Nunes's generic allegation that the Post "combined, associated, agreed or acted in concert with House Democrats," Compl. ¶ 26, is nothing more than parroted language from Virginia's conspiracy statute, *see* Va. Code Ann. § 18.2-499 ("Any two or more persons who combine, associate, agree, mutually undertake or concert together . . . ."). Such threadbare allegations will not suffice. *Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks omitted)).

Indeed, multiple courts in this district have dismissed similar conspiracy claims brought by Rep. Nunes's counsel on precisely these grounds. *See, e.g.*, *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 498–99 (E.D. Va. 2003) (allegation that co-conspirators "combined, associated, agreed or acted in concert" to put plaintiff out of business "is woefully inadequate" and "fails to allege a number of the required elements of conspiracy" (internal quotation marks omitted)); *Kylin Network*, 2017 WL 2385343, at *4 (dismissing conspiracy claim because the allegation that the parties "combined, associated, agreed or acted in concert together (or attempted to do so) for the express purpose of injuring [defendant] in his business and professional reputation" was nothing more than "mere conclusory language") (internal quotation marks omitted)); *Cox*, 2015 WL 1640513, at *6 (allegation that alleged co-conspirators "combined, associated, agreed or acted in concert together for the purposes of willfully and maliciously injuring [plaintiff] in his business and property" is "vague" and "insufficient to state a claim" (internal quotation marks omitted)); *Lokhova*, 2020 WL 963032, at *18 (holding that the "conspiracy allegations are too conclusory to survive a motion to dismiss") (citing cases). So too here. The conspiracy claim is implausible and must be dismissed.

28

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.


Dated:  March 26, 2020                       Respectfully submitted,

                                             WILLIAMS & CONNOLLY LLP

                                             By:      /s/ *Emily A. Rose*

                                             Kevin T. Baine (*pro hac vice* pending)
                                             Thomas G. Hentoff (*pro hac vice* pending)
                                             Nicholas G. Gamse (*pro hac vice* pending)
                                             Emily A. Rose (VSB No. 89529)


                                             725 Twelfth Street, N.W.
                                             Washington, DC 20005
                                             Telephone: (202) 434-5000
                                             Facsimile: (202) 434-5029
                                             erose@wc.com

                                             *Counsel for WP Company LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2020, I electronically filed the foregoing Memorandum of Law in support of the Washington Post's Motion to Dismiss with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

/s/ *Emily A. Rose*
*Counsel for WP Company LLC*